**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **DAVID GEVAS,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 3:23 C 50249** |
| **Dr. P. POPOVICH, Eye Doctor, Wexford Health Sources; NIKI BONNELL, Nurse, Dixon Correctional Center; MONICA CARPENTER-FULLER, Healthcare Unit Administrator, Dixon Correctional Center; Dr. LARRY SY, Medical Director, Dixon Correctional Center; SUSAN TUELL; and LAURA L. EMMOLE,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff David Gevas is currently incarcerated at Dixon Correctional Center ("Dixon"), an Illinois Department of Corrections ("IDOC") facility located in Dixon, Illinois. On February 17, 2023, he had an annual appointment at the University of Illinois Chicago ("UIC") Retinal Clinic \t. Dr. Chau, the ophthalmologist at UIC, diagnosed Gevas as having degenerative myopia with choroidal neovascularization, an eye condition that can lead to vision loss. On May 1, 2023, Gevas saw Nurse Practitioner ("NP") Susan Tuell for a podiatry appointment, during which he also complained of worsened vision. Tuell referred him to Dr. Peter Popovich, Dixon's on-site optometrist. Because of a lockdown at Dixon, Gevas did not see Dr. Popovich until nine days later, on May 10, 2023. In that appointment, believing that Gevas had a detached retina, Dr. Popovich submitted an urgent request for Gevas to return to UIC's Retina Clinic, where Gevas went the next day, on May 11, 2023. Dr. Chau ordered injections in Gevas's eye to improve his condition, and he continued to receive injections every few weeks until at least January 2025.

In this lawsuit, brought under 42 U.S.C. § 1983, Gevas alleges that delays in his care violated his Constitutional rights under the Eighth Amendment. He brings this claim of deliberate indifference against several Dixon staff employed both by IDOC and Wexford Health Sources,

Inc. ("Wexford"), a healthcare service provider that contracts with IDOC. Defendant Wexford employees Dr. Peter Popovich, Dr. Larry Sy, Nichole Bonnell, and NP Tuell moved for summary judgment on September 26, 2025. (Wexford MSJ [184].) Defendant IDOC employees Monica Fuller (nee Carpenter) and Laura Emmole moved for summary judgment on October 10, 2025. (IDOC MSJ [195].[1]) The court grants both motions.

## BACKGROUND

The facts herein are taken from the parties' respective Local Rule 56.1 filings, as well as the record evidence submitted by the parties. As it must at summary judgment, the court takes disputed facts in the light most favorable to Gevas, the nonmoving party. *See In re Greenpoint Tactical Income Fund LLC*, 168 F.4th 1002, 1007 (7th Cir. 2026). All facts set forth herein are undisputed unless otherwise noted.

Gevas is currently incarcerated at Dixon. (PSOF [212] ¶ 1.) On February 17, 2023, Dr. Felix Chau, an ophthalmologist, saw Gevas at the UIC Retinal Clinic for an annual evaluation of his retinas. (PSOF [212] ¶ 14; Wexford DSOF ¶ 12.) Gevas testified that he had previously visited Joliet Retina Clinic and that he has been seen by retina specialists since 2015, but he does not recall his diagnosis, why he required follow-up appointments, or when he began seeing Dr. Chau annually. (Gevas Dep. [196-1] at 13:5–8, 14:5–7; Gevas affidavit [215] ¶ 1.[2])

At the February 17, 2023 appointment, Dr. Chau diagnosed Gevas with degenerative myopia with choroidal neovascularization. (PSOF [212] ¶ 14; Medical Records [212-1] at 160.) Myopic degeneration occurs when "severe nearsightedness damages [one's] retina, causing

---

[1] The court will refer to Defendants Popovich, Sy, Bonnell, and Tuell's filings as "Wexford," and Defendants Fuller and Emmole's filings as "IDOC."

[2] The court does not consider Gevas's first affidavit, submitted January 15, 2026, because he failed to sign it. (Gevas affidavit [212-1] at 4; *see* 8 U.S.C. § 1746.) The court exercises its discretion to consider Gevas's second, signed affidavit, which he filed within the reply deadline. (*See* Grant of Motion for Time Extension [210].)

vision loss."[3] Choroidal neovascularization ("CNV") "is a condition of the eye where new blood vessels grow in the choroid layer of the eye, which can cause fluid and blood to leak into the retina." (PSOF [212] ¶ 15.) The fluid and blood leakage "can cause vision loss." (*Id.*) While the parties agree on Gevas's CNV diagnosis, Gevas additionally alleges that his eye scan from this appointment "show[ed] what look[ed] like a lump in the right eye, lower right corner that had increased in size, and this was why, [he] was told, [his] right eye sight had worsened." (Gevas affidavit [215] ¶ 2.) He also alleges that Dr. Chau told him that if his "right eye sight worsen[ed], it was imperative that Plaintiff return to UIC Retina Clinic urgently for treatment." (*Id.*) Defendants point out that the medical records do not corroborate these statements. (IDOC Resp. to PSOF [223] ¶ 14; Wexford Resp. to PSOF [218] ¶ 14.) Instead, Dr. Chau noted: "Evidence of quiescent choroidal neovascularization; patient should return for any sudden central vision distortion. If there are worsening floaters, flashes, or curtain symptoms,[4] the patient should return within 1 day to evaluate for retinal tear or detachment." (Medical Records [212-1] at 160.) Dr. Chau did not make note of a lump in Plaintiff's eye in the medical records provided to the court.

On February 21, 2023, Dr. Sy—the Medical Director at Dixon, employed by Wexford—met with Gevas for a medical writ follow-up appointment. (Wexford Resp. to PSOF [218] ¶ 16; Wexford DSOF [186] ¶ 2.) Sy submitted a request for Gevas to have a one-year follow-up appointment at the UIC Retinal Clinic, as Dr. Chau recommended. (Third Sy Decl. [218-1] ¶ 3; Medical Records [218-1] at 3–4.) Then, on February 22, 2023, Dr. Popovich—a Wexford employee and Dixon's optometrist—"conducted an Offender Optometric Examination and found that Gevas had 20/25 vision in his right eye." (PSOF [212] ¶ 17; DSOF [196] ¶ 3.) That

---

[3] *Myopic Degeneration (Degenerative Myopia)*, CLEVELAND CLINIC (Apr. 29, 2025), https://my.clevelandclinic.org/health/diseases/myopic-degeneration.

[4] "The symptom described as 'a shadow or gray or dark curtain' is when all or part of your vision is blocked by dark or blurred shapes. It often begins on your side (or peripheral vision) . . . ." George A. Williams & Daniel Porter, *Shadow or a Gray or Dark Curtain in Vision*, Am. Acad. Ophthalmology (Aug. 12, 2026), https://www.aao.org/eye-health/symptoms/dark-curtain.

measurement means that Gevas could see at 20 feet what an average person could see at 25 feet; in other words, he had slightly worse than 20/20, or "normal," vision.[5] The parties do not address why Dr. Popovich saw Gevas on February 22, but the medical record reflects that Gevas had mild irritation in his eye after the UIC visit and that Dr. Popovich instructed him to quit using artificial tears, which were not compatible with his contact lenses. (Medical Records [211] at 17.) According to medical records, Gevas said he understood Popovich's instructions, including instructions to return if "s[ymptoms] worsen[ed] [or] d[id] not resolve" and "to F/U [follow up] with UIC as directed." (*Id.*)

On May 1, 2023, NP Tuell saw Gevas for a podiatry appointment. (Wexford DSOF [186] ¶ 6.) There, Gevas complained of deteriorating vision in his right eye and said that it "felt to [him] like a plastic bag was being pulled over the eye." (Gevas affidavit [215] ¶ 6; Medical Records [196-2] at 3.) It is unclear whether Gevas had requested an appointment with Dr. Popovich prior to his podiatry appointment, given Popovich's February 22 instructions to return if he noticed further symptoms. In any event, after Gevas voiced this complaint, NP Tuell submitted an Optometry Services Referral and Report so that he could see Dr. Popovich. (Medical Records [196-2] at 3; Wexford Resp. PSOF [218] ¶ 18; Tuell Dep. [196-4] at 19:14–20.) According to Plaintiff, Tuell indicated "that an emergency existed"; but Tuell's notes[6] do not characterize the situation as an emergency. (PSOF [212] ¶ 19; Progress Notes [212-8] at 1.) Instead, Tuell documented Gevas's right eye vision deterioration and wrote that "Pt req on site Dr take a look @ it," meaning that Gevas specifically requested on-site care. (Progress Notes [212-8] at 1.)

Wexford staff put Gevas on the schedule to see Dr. Popovich. Defendant Nichole Bonnell

---

[5] Celia Vimont, *What Does 20/20 Vision Mean?*, AM. ACAD. OPHTHALMOLOGY (Feb. 25, 2025), https://www.aao.org/eye-health/tips-prevention/what-does-20-20-vision-mean (last visited Sept. 23, 2026).

[6] The notes are dated May 2, but NP Tuell testified that her staff likely prepared the document and mistakenly wrote the wrong date. In other words, NP Tuell's staff likely took these notes on the same day of her visit with Gevas, May 1. (Tuell Dep. [196-4] at 17:14–18:4.)

is responsible for "scheduling patients to see Dr. Peter Popovich for optometry appointments based on the referral requests she receives directly from the nursing staff or providers" at Dixon. (Wexford DSOF [186] ¶ 7.) Bonnell schedules the appointments in the order they are submitted to her "unless a patient is referred urgently or emergently to Dr. Popovich, in which case the patient would be seen at the next possible appointment with Dr. Popovich." (*Id.*) Because Tuell did not designate the optometry referral request as "urgent" or "emergent," Bonnell scheduled Gevas for Popovich's next available appointment. (*Id.* ¶ 8.) Bonnell testified, and Gevas agreed, that she likely did not receive the referral request until May 2. (Bonnell Decl. [186-6] ¶ 9; Pl. Resp. to Wexford DSOF [213] ¶ 9.)

Dr. Popovich was scheduled to see Dixon patients on May 3, May 4, and May 10, 2023. On May 3, however, Dixon was on a Level 1 lockdown. (Pl. Resp. to Wexford DSOF [213] ¶ 10.) During lockdowns, Dixon limits the movement of prisoners "for safety and security reasons, which is why sick call gets cancelled and inmates are rescheduled to be seen." (Emmole Interrogatory [212-11] ¶ 3.) "[M]edical providers determine if an [inmate] needs to be seen on an emergency basis." (Fuller Decl. [196-5] ¶ 11.) Dr. Popovich was scheduled to see 14 patients on May 3, but all of those appointments were rescheduled due to the lockdown. (Pl. Resp. to Wexford DSOF [213] ¶ 10.) Dr. Popovich saw nine of those patients on May 4, 2023, and Bonnell scheduled Gevas to see Popovich "on May 10, 2023, which was the earliest appointment available." (Wexford DSOF [186] ¶ 10.) Between May 3 and May 9, Gevas submitted multiple sick call requests to address his eye issue. (PSOF [212] ¶ 20.) On the sick call requests, Gevas characterized his eye issue as an "emergency," noting his worsening right eye blurriness and speculating that he might have a detached retina. (*Id.*; Sick Calls [196-9] at 1–3.) Defendants admit that Gevas submitted the sick call requests regarding his vision issues, but dispute that these issues constituted a medical emergency. (Wexford Resp. to PSOF [218] ¶ 20; IDOC Resp. to PSOF [223] ¶ 20.)

During this period—on May 5—Gevas told Health Care Unit Administrator[7] (HCUA) Monica Fuller about his vision issues and his request "to have the UIC February 17 note followed." (PSOF [212] ¶ 22.) He "explained that a referral had been created, that he had submitted requests for sick call, and that his condition was worsening each day." (*Id.*) Gevas testified that Fuller told him to write to Dr. Popovich. (IDOC Resp. to PSOF [223] ¶ 22; Gevas Dep. [196-1] at 28:2–11.) With respect to the period between May 1 and May 10, Gevas also argues that "[t]he person responsible for not honoring [sick call] passes was Nurse Emmole, who ignored [his] request." (Pl. Mem. Opp. MSJ [214] at 6.) But as Gevas admits, Emmole "was assigned to the Charge Nurse position on day shift from May 6th through 9th of 2023 at Dixon," and she "did not run sick call or triage any sick call requests on these dates." (Pl. Resp. to IDOC DSOF [222] ¶ 23.)

On May 10, 2023, Gevas had his appointment with Popovich, who diagnosed Gevas with a retinal detachment in his right eye and noted that Gevas had been seeing floaters and flashes of light. (PSOF [212] ¶ 23; Medical Records [196-2] at 4; Wexford DSOF [186] ¶ 11.) Dr. Popovich submitted an urgent referral for Gevas to see a retina specialist at UIC's Retina Clinic for the possible retinal detachment. (Wexford DSOF [186] ¶ 11; Medical Records [196-2] at 3.) The next day, on May 11, 2023, Dr. Chau diagnosed Gevas with degenerative myopia with CNV of his right eye—that is, the exact same diagnosis Gevas had received in February of that year. (Wexford DSOF [186] ¶ 12; Medical Records [212-1] at 155, 157.) It appears that Dr. Popovich's assessment that Plaintiff had suffered a retinal detachment was inaccurate; Dr. Chau's diagnosis does not mention a detached retina. (Pl. Resp. Wexford DSOF [213]; Medical Records [212-1] at 155–59.) Furthermore, Dr. Chau's progress notes make no "mention that there was a delay or that any delay impacted Plaintiff's visit and diagnosis." (IDOC DSOF [196] ¶ 43.) Dr. Chau noted Gevas's vision measured 20/150, a decline since February when his vision measured 20/25. (Wexford Def. Resp. PSOF [218] ¶¶ 17, 24.) He also gave Gevas Avastin injections in his right

[7] Fuller had been HCUA at Dixon since February 2022. The HCUA "oversees the daily administrative functions of the entire Health Care Unit." (PSOF [212] ¶ 6.)

eye, presumably to address the newly-reported vision loss; Avastin "improve[s] vision by blocking the growth and leakage of abnormal blood vessels in the eye that are causing vision loss." (Wexford DSOF [186] ¶ 13.) Dr. Chau included the same follow-up instructions as he did during the February appointment: to return if Gevas noticed worsening symptoms. (Medical Records [212-1] at 155, 157.)

Next, on May 16, 2023, Dr. Sy saw Gevas on a medical writ follow-up appointment and approved further injections. (Medical Records [186-4] at 7; PSOF [212] ¶ 25.) Gevas asserts that "Dr. Sy never ordered future UIC Retina Clinic visits or injections," but that assertion is rebutted by the medical records: Dr. Chau's referral sheet, which Dr. Sy approved, directed Gevas to return for injections in 5–6 weeks. (Medical Records [186-4] at 7; PSOF [212] ¶ 25.) Gevas received injections on July 5, September 7, October 5, and November 16, 2023. (Pl. Resp. to Wexford DSOF [213] ¶ 14.) He continued receiving injections of medications comparable to Avastin[8] between January 2024 and January 2025. (*Id.* ¶¶ 16–26.) Over the course of Gevas's injection appointments, Dr. Chau noted improvement in the intraretinal fluid buildup, and Gevas eventually reported that his right eye vision had improved. (DSOF [186] ¶¶ 16, 20, 24, 25; Pl. Resp. to Wexford DSOF [213] ¶ 26.)

In his complaint, Gevas alleges that he "missed multiple scheduled injection [appointments after May 11] as recommended/plan[n]ed for treatment for his right eye . . . ." (Compl. [134] ¶ 12.) For the first time, at summary judgment, Gevas claims that his second injection appointment occurred roughly 8 weeks after his May 11 appointment, instead of the recommended 4–6 weeks (Pl. Mem. Opp. MSJ [214] at 2); he similarly implies that his third appointment, on September 7, 2023, was delayed; and he argues that "Dr. Sy did not create a necessary plan for care" in receiving his Avastin injections. (*Id.* at 2, 9.) However, because these allegations do not appear

[8] Gevas received injections of Eylea and Vabysmo, both of which "stabiliz[e] blood vessels in the eye [to] prevent[] fluid from leaking into the retina," like Avastin. (Wexford DSOF [186] ¶¶ 16–17. It is unclear why Dr. Chau switched Gevas from Avastin to Eylea, and Gevas later requested to try Vabysmo instead of Eylea. (*Id.* ¶ 17.)

in Gevas's amended complaint [134]—he does not allege any facts occurring after May 11, 2023, despite filing the complaint in March 2025—the court declines to address these contentions, beyond noting that the record does not confirm that the alleged delays were significant.[9] *See, e.g.*, *Ollison v. Gossett*, 136 F.4th 729, 738–40 (7th Cir. 2025) (upholding district court's refusal to consider new factual allegations raised for the first time at summary judgment, because it is "rarely . . . appropriate" to treat claims presented at this stage of litigation as a "constructive motion to amend" (internal quotation marks and citation omitted)).

Plaintiff filed a *pro se* complaint [1] on July 6, 2023. He filed his latest amended complaint on March 26, 2025, bringing a cause of action pursuant to 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment constitutional rights arising out of his medical treatment in May 2023 (Amended Compl. [134].) Counsel appeared on his behalf in November 2025. (Attorney appearance [204].) Defendants Popovich, Sy, Bonnell, and Tuell moved for summary judgment on September 26, 2025. (Wexford MSJ [184].) Defendants Fuller and Emmole moved for summary judgment on October 10, 2025. (IDOC MSJ [195].) Gevas filed a response to IDOC defendants' statement of facts (Pl. Resp. to IDOC DSOF [222]), a response to Wexford Defendants' statement of facts (Pl. Resp. to Wexford DSOF [213]), his own statement of facts (PSOF [212]), and a memorandum opposing both sets of defendants' motions to dismiss. (Pl. Mem. Opp. MSJ [214].) The IDOC and Wexford Defendants have both replied. (IDOC Reply MSJ [224]; Wexford Reply MSJ [219].)

---

[9] The record contains inconsistencies as to how often a patient should receive such injections: Gevas admitted that a patient should receive injections between four to eight weeks but later testified that he "was to return to the UIC clinic every 4–6 weeks for more injections." (Pl. Resp. to Wexford DSOF [213] ¶ 14; Gevas Affidavit [215] ¶ 18.)

## DISCUSSION

### I. Legal Standard

"Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016) (quoting FED. R. CIV. P. 56(a)). Parties genuinely dispute a material fact where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021)). "A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge." *Id.* (citing *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018)).

### II. Analysis

#### A. Plaintiff's Expert Reports

As a preliminary matter, the court declines to consider Gevas's expert witness reports because they do not comply with the Federal Rules of Civil Procedure. On January 15, 2026, Plaintiff submitted two expert reports: one by Dr. Mathew W. MacCumber, and another by Timothy O'Leary, O.D. (MacCumber Rep. [212-2]; O'Leary Rep. [212-3].) Dr. MacCumber states that "[t]he delay that occurred before treatments for [Gevas's] retinal problem likely contributed to [his] decreased visual outcome because untreated choroidal neovascularization can lead to retinal damage." (MacCumber Rep. [212-2] at 2.) The O'Leary report contains general explanations for interpretation of a visual assessment; whatever the value of these explanations, Gevas does not mention the report in his memorandum opposing summary judgment. (O'Leary Rep. [212-3] 3–4; Pl. Mem. Opp. MSJ [214].)

Plaintiff's expert reports do not comply with Federal Rule of Civil Procedure 26(a)(2)(B). Under this rule, expert reports must include:

> (i) a complete statement of all opinions the witnesses will express and the basis and reasons for them; (ii) the facts or data considered by the witnesses in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and the testimony in the case.

FED R. CIV. P. 26(a)(2)(B). Dr. MacCumber's and Dr. O'Leary's reports fail to meet several of these requirements. In his one-page report, Dr. MacCumber did not disclose the bases and reasons for his opinions, the facts or data he used to form his opinions, his qualifications or a list of his publications, or a statement of any compensation he may have received.[10] (MacCumber Rep. [212-2] at 2.) O'Leary submitted a three-page report in which he did not disclose the reason or basis for his opinions, the facts or data he used to form his opinions, or a list of his qualifications or publications. (O'Leary Rep. [212-3] at 2–4.)

The purpose of an expert report "is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response." *Meyers v. National R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010). If a party fails to comply with Rule 26(a)(2)(B), the court may exclude the expert's testimony unless the reporting defect "was substantially justified or is harmless." *Id.* (quoting FED. R. CIV. P. 37(c)(1)) (citation omitted). Here, there is no indication that the reports' defects were substantially justified. By the time Plaintiff submitted the reports, he had been represented by counsel for several weeks, and his counsel attached a cover letter signing off on each of the reports. (*See* MacCumber Rep. [212-2]; O'Leary Rep. [212-3].) While a *pro se* plaintiff may be less familiar with the Federal Rules of Civil Procedure, counsel should be well aware of Rule 26(a)(2)(B)'s requirements and should have instructed Plaintiff's experts to make all the required disclosures. Furthermore, the error is not harmless. The court has no way to decipher how Drs. MacCumber and O'Leary formed their

---

[10] MacCumber wrote, "[i]f deposed, my rate is $5000 a day, payable in advance," but he did not clarify whether he was paid to provide the report he submitted. (MacCumber Rep. [212-2] at 2.)

opinions or what documents or data they reviewed in forming them. The court cannot consider this evidence without prejudicing Defendants. Moreover, Gevas's counsel submitted the reports on the day of Plaintiff's response deadline and two weeks prior to Defendant's reply deadline, rendering Defendants effectively unable to depose these experts or offer their own rebuttal experts. (Wexford Def. Rep. MSJ [219] at 1.) Therefore, the court will not consider either expert report in ruling on Defendants' motions for summary judgment. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004) (upholding district court's decision to disallow witnesses to testify as experts when Plaintiff failed to make the required FED. R. CIV. P. 26(a)(2)(B) disclosures).

**B. Deliberate Indifference**

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody," and proscribes deliberate indifference to serious medical needs of prisoners. *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (citation omitted). To succeed on a deliberate indifference claim, Gevas "must establish that [he] had an objectively serious medical condition and that [the Defendants were] deliberately indifferent to that condition." *Christensen v. Weiss*, 145 F.4th 743, 752 (7th Cir. 2025). Further, Gevas must show that Defendants' deliberate indifference injured him. *Stockton*, 44 F.4th at 614.

There is an objective and subjective component to a deliberate indifference claim. First, Gevas must show that he had an objectively serious medical condition. *Clemons*, 106 F.4th at 635. "An objectively serious medical condition is one that 'a physician has diagnosed as needing treatment' or that is so obviously serious 'that even a lay person would easily recognize the necessity for a doctor's attention.'" *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016) (quoting *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009)). Second, Gevas must show that the Defendants acted with deliberate indifference when considering their subjective state of mind. Deliberate indifference means that the Defendants "knew of and 'consciously disregarded a

serious risk to [the plaintiff's] health.'" *Clemons*, 106 F.4th at 635 (citation omitted). In other words, each Defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Stockton*, 44 F.4th at 615 (citation omitted). Deliberate indifference goes beyond negligence or gross negligence. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence, does not violate the Constitution."). Deliberate indifference can be established through inference from circumstantial evidence. *Christensen*, 145 F.4th at 752. "'A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain,' and 'even brief, unexplained delays in treatment may constitute deliberate indifference.'" *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citation omitted). To establish deliberate indifference based upon treatment delays, however, a plaintiff must present "verifying medical evidence" that the delay, rather than the underlying condition, caused "some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)).

Defendants do not dispute that Gevas's CNV and vision loss in his right eye was an objectively serious medical condition. (IDOC Mem. Supp. MSJ [197] at 5; Wexford Mem. Supp. MSJ [185].) Instead, each Defendant argues that Gevas has failed to prove the subjective element of his claim—that they were deliberately indifferent to his condition—or that their deliberate indifference caused Gevas's injuries. (IDOC Mem. Supp. MSJ [197] at 6, 8–9.)

Plaintiff's central argument is that "delays in treatment contributed to [his] vision loss." (Opp'n [214] at 1; PSOF [212] ¶ 29.) He contends that Drs. Popovich and Sy, as well as Fuller, should have created a treatment plan to monitor his vision after the February 17 appointment, that Dr. Popovich should have monitored his condition and known he needed to be seen on an emergency basis in early May, that Fuller should have "gotten [him] back to UIC sooner than May 11," that Tuell knew of the emergency and did not seek immediate help, that Bonnell should have tried to secure him an earlier appointment with Popovich, and that Emmole should have

sought a determination from a provider as to whether Gevas faced an emergency (presumably to prioritize his care). (Opp'n [214] at 7–10, 12–13.) He states that Fuller "did nothing," that nobody told Sy to call UIC, and that Popovich "never followed up." (Gevas affidavit [215] ¶ 24.) In sum, Gevas contends that Defendants should have expedited his care given Dr. Chau's February recommendation to return to the UIC Retina Clinic within one day if he noticed floaters, flashes, or curtain symptoms. (Opp'n [214] at 4 (contending that "no one gave [Gevas] the care that . . . Dr. Chau[] stated that he needed").)

At the same time, Gevas admits that there was little Defendants could do to schedule him with an offsite provider sooner. For instance, Gevas admits that Fuller, Emmole, Tuell, and Bonnell had no authority to schedule appointments with external specialists. (Pl. Resp. to IDOC DSOF [222] ¶ 11, 21; Pl. Resp. to Wexford DSOF [213] ¶¶ 4, 5.) Moreover, Tuell's notes from Gevas's initial complaint on May 1 show that he requested on-site, rather than off-site, care. (Progress Notes [212-8] at 1.) As to Fuller, Gevas admits that she could not "prescribe any medical care/treatment" or "schedule appointments with physicians or nurse practitioners at Dixon." (*Id.* ¶ 11.) Drs. Sy and Popovich assert that they had no role in scheduling offsite appointments for inmates; rather, a staff assistant typically scheduled such appointments subject to the offsite provider's availability. (Wexford DSOF [186] ¶¶ 2, 3.)

Gevas disputes this description of the doctors' roles. He alleges that Sy "does have a say in directing . . . offsite appointment[s]," but Gevas points only to his own testimony as evidence for this assertion. (Pl. Resp. to Wexford DSOF [213] ¶ 2.) He also alleges that Popovich "directed that an emergency urgent visit be scheduled off-site," citing Popovich's referral to UIC on May 10 as evidence. (*Id.* ¶ 3; Medical Records [196-2] at 3.) But this is entirely consistent with Popovich's statement that he cannot schedule offsite appointments: his ability to *refer* patients off-site does not mean he can *schedule* them off-site.

The Seventh Circuit has acknowledged that correctional facilities "have limited resources, and that fact makes some delay inevitable." *Zemlick v. Burkhart*, 164 F.4th 1004, 1014 (7th Cir.

2026) (quoting *Mitchell v. Kallas*, 895 F.3d 492, 500 (7th Cir. 2018)). True, even brief delays in care can amount to deliberate indifference. *Lewis*, 864 F.3d at 563. But construing the evidence in the light most favorable to Gevas and presuming that he should have immediately returned to the clinic within one day of May 1, notwithstanding the limitations on Wexford and IDOC staff, he still must show that the delay between then and May 11 in fact harmed him. Gevas has not presented "verifying medical evidence" that the delay between May 1 and May 11—not his underlying condition—contributed to his vision loss. *Walker*, 940 F.3d at 964 (quoting *Jackson*, 733 F.3d at 790).

Gevas had been diagnosed with CNV, which can lead to vision loss, back in February 2023. (PSOF [212] ¶¶ 14, 15.) Gevas offers no medical evidence that the ten-day delay between May 1, when he first told NP Tuell about his worsened vision, and May 11, when he saw Dr. Chau and began receiving injections, exacerbated his vision loss. The court has already explained its unwillingness to consider Dr. MacCumber's report, but notes that the report does not present a triable issue of fact for the jury on this issue. Dr. MacCumber states that "[t]he delay that occurred *before treatments* for [Gevas's] retinal problem likely contributed to [his] decreased visual outcome *because untreated choroidal neovascularization can lead to retinal damage*." (MacCumber Rep. [212-2] at 2 (emphasis added).) But Dr. Chau—the ophthalmologist, who is not a Defendant here—diagnosed Gevas with CNV in February and did not treat him with injections until May. The "delay that occurred before treatments," then, began on February 17, not May 1. MacCumber's expert report thus does not establish that the ten-day delay in early May caused Plaintiff "some harm." *Walker*, 940 F.3d at 964 (citing *Jackson*, 733 F.3d at 790). Gevas did not "offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental" to him. *Jackson*, 733 F.3d at 790 (quoting *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007)). As such, no reasonable jury could find that his delay in care contributed to his loss of vision or that such delays constituted deliberate indifference.

To the extent that Gevas presents other, more peripheral arguments of deliberate

indifference, they are similarly unavailing. For instance, Gevas urges that Fuller's, Sy's, and Popovich's "failure to create a treatment plan" or "fail[ure] to monitor Gevas's condition" after his February appointment establishes Defendants' "culpable mental state." (Opp'n [214] at 7, 8, 10.) However, Dr. Chau's own treatment plan simply required a one-year follow-up and for Gevas to return within one day if he noticed floaters, flashes, or curtain symptoms. (Third Sy Decl. [218-1] ¶ 3; Medical Records [218-1] at 3–4.) Dr. Chau—the specialist in charge of Gevas's eye care—did not indicate that Gevas's condition "required vigilant monitoring," as Gevas claims. (Opp'n [214] at 8–9.) Plaintiff's arguments with respect to a "treatment plan," and "monitoring" his condition, therefore, fall flat. Finally, Plaintiff contends that various Defendants' actions or inactions contributed to delays in his receiving injections after May 11. But he does not state that these delays contributed to his vision loss. (PSOF [212] ¶¶ 26–28; Opp'n [214] at 2.) He has offered no evidence nor any expert testimony establishing that delays between injection appointments caused or contributed to his vision loss.

## CONCLUSION

Gevas suffered vision loss because of his condition diagnosed in February 2023: CNV. When he brought his vision loss to the attention of medical providers on May 1, 2023, he did not receive specialist treatment for another ten days. But the evidence does not show that this delay caused him additional harm, nor does it show that Defendants Popovich, Sy, Bonnell, Tuell, Emmole, or Fuller were deliberately indifferent to his serious medical condition. The motions for summary judgment [184] [195] are therefore granted.

ENTER:

Dated: September 29, 2026

REBECCA R. PALLMEYER
United States District Judge